**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                                      )
**IN RE:  ZOFRAN (ONDANSETRON)**      )
**PRODUCTS LIABILITY LITIGATION,** )         **MDL No. 1:15-md-2657-FDS**
                                                      )
**This Document Relates To:**                )
                                                      )
   **All Actions**                              )
_____)

### MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION TO AMEND THE MASTER COMPLAINTS

**SAYLOR, J.**

This is a multi-district litigation ("MDL") proceeding arising out of product-liability

claims that the use of the drug Zofran by pregnant women caused birth defects.  In their master

long-form complaints, plaintiffs alleged claims of misrepresentation in addition to more standard

product-liability claims such as negligence and breach of warranty.  Specifically, the master

complaints alleged that defendant GlaxoSmithKline LLC made false and misleading statements

and omissions about the use of Zofran during pregnancy in their marketing, advertising, and

product labeling, and in other oral and written communications.  Based on those allegations, they

asserted claims for negligent misrepresentation, fraudulent misrepresentation, and violation of

state consumer-protection statutes.[1]

On April 24, 2017, the Court dismissed the claims based on allegedly fraudulent

marketing and advertising for failure to comply with the heightened pleading standards of Fed.

R. Civ. P. 9(b).  It did not, however, dismiss the claims for misrepresentation arising out of the

FDA-approved label.

---

[1] For the sake of convenience, and unless the context indicates otherwise, the Court will use the term "misrepresentation" for all such claims.

Plaintiffs have now moved to amend the master complaints to reassert claims of misrepresentation based on marketing and advertising and other "off-label" representations. In substance, plaintiffs contend that discovery has revealed the existence of a widespread and fraudulent marketing scheme by GSK representatives that was intended to promote the use of Zofran notwithstanding its dangers. They contend that the evidence derives from internal GSK documents, and that those documents could not reasonably have been discovered prior to filing suit.

Plaintiffs seek to amend the master complaints to assert claims for misrepresentation only in general terms, identifying particular misrepresentations that were allegedly made by GSK representatives over the years. Individual plaintiffs would then adopt those allegations that apply to their particular circumstances. Defendant GSK has opposed the motion to amend on grounds of futility and undue delay.

The Court agrees that the motion is untimely and will deny it on that basis, without reaching the issue of futility. To begin, a motion to dismiss has been granted on the very same issue; as a general matter, plaintiffs are not permitted to amend a complaint after dismissal to try to cure problems pointed out by the court. Here, however, plaintiffs contend that discovery has produced new evidence, and that the amended complaint could not have been brought in its present form before that information was uncovered.

The basic problem with that argument is that it conflates the evidence of the *representations* made by GSK representatives with the evidence of the alleged *falsity* of those representations. The representations at issue have not been hidden from view: to the contrary, they were allegedly made to plaintiffs' physicians (who, plaintiffs say, relied on them). The representations were largely made openly—in fact, according to plaintiffs, they were made as

2

part of a huge marketing campaign, and were published or broadcast to thousands of physicians nationwide. Thus, that information has been actually or constructively available to plaintiffs from the very beginning. What has been hidden, if at all, is evidence that those representations were false, or part of a widespread scheme.

Regardless, Rule 9(b) requires that claims of fraud be pleaded with specificity. Such claims are not to be made in general terms, with the details of the alleged misrepresentation to be filled in once discovery has occurred. Accordingly, and for the reasons set forth below, the proposed amendment of the master complaint to add new misrepresentation claims is untimely, and the motion to amend will therefore be denied.

## I.     Background

Unless otherwise noted, all facts are stated as set forth in the master complaints.[2]

### A.     The Parties and Zofran

GlaxoSmithKline LLC ("GSK") is a pharmaceutical company based in Wilmington, Delaware. (Master Long Form Complaint-Brand Zofran Use ("Compl.") ¶¶ 2-3). It is a subsidiary of GlaxoSmithKline PLC. (*Id.* ¶ 4). Until March 23, 2015, GSK was the sponsor of the new drug applications ("NDAs") for the pharmaceutical Zofran, or ondansetron. (*Id.* ¶ 6).

Zofran is an anti-emetic—that is, a drug that prevents or treats nausea or vomiting. (*Id.* ¶ 17). In 1991, Zofran was approved for marketing in the United States. (*Id.* ¶ 23). It was approved for the prevention of nausea and vomiting induced by chemotherapy or radiation therapy and post-operative nausea and vomiting. (*Id.* ¶ 16). Generic ondansetron became

---

[2] There are two master complaints in this proceeding—one on behalf of all plaintiffs alleging that they ingested brand-name Zofran and another on behalf of all plaintiffs alleging that they ingested generic ondansetron—as well as individual short-form complaints for each plaintiff. The master complaints set forth the factual allegations common to all plaintiffs. For the sake of convenience, the Court will cite to the Zofran master complaint as "the complaint" unless otherwise indicated.

available in the United States in 2007. (Master Long Form Complaint-Generic Use ("Generic Compl.") ¶ 27).

The plaintiffs in this MDL proceeding are parents and guardians of children who allege that they were born with birth defects caused by prenatal exposure to Zofran and/or generic ondansetron. (*Id.* ¶ 1).

**B.        Alleged Effects of Zofran/Ondansetron on Embryonic Development**

Zofran is part of a class of anti-emetics referred to as selective serotonin 5-HT3 receptor antagonists. (*Id.* ¶ 17). Serotonin signaling in the body triggers nausea and vomiting. (*Id.* ¶ 19). The active ingredient in Zofran, ondansetron, is believed to alleviate symptoms of nausea and vomiting by inhibiting the body's serotonin signaling. (*Id.*).

Serotonin signaling regulates developmental processes that are critical to normal embryonic development. (*Id.* ¶ 20). Inhibiting serotonin signaling during embryonic development can therefore increase the risk of birth defects. (*Id.*). According to the complaint, pre-clinical studies conducted by or on behalf of GSK in the 1980s revealed that Zofran ingested by mammals—in particular, rats and rabbits—during pregnancy crosses the placental barrier, exposing the fetus to the drug. (*Id.* ¶ 43). The complaint alleges that subsequent scientific research has confirmed that Zofran also crosses the placental barrier during human pregnancies. (*Id.* ¶ 44).

According to the complaint, animal studies conducted by or on behalf of GSK in the 1980s in Japan revealed clinical signs of toxicity, intrauterine fetal deaths, stillbirths, congenital heart defects, craniofacial defects, impairment of ossification (incomplete bone growth), and other malformations in fetuses exposed to Zofran during gestation. (*Id.* ¶ 45). The complaint also alleges that from 1992 to the present, GSK has received reports—either directly or through

4

studies published in medical literature—of birth defects in children exposed to Zofran or ondansetron during pregnancy. (*Id.* ¶ 46).

### C.    Allegations of Misrepresentation in Current Master Complaint

In response to this Court's order dated May 18, 2016, plaintiffs filed a brand-name master complaint and generic master complaint on May 31, 2016.[3] Individual plaintiffs then subsequently filed short-form complaints adopting a master complaint with more detailed individual information concerning their claims.

According to the current master complaint, beginning around 1997, GSK "launched a marketing scheme to promote Zofran to obstetrics and gynecology healthcare practitioners and consumers as a safe and effective treatment for pregnancy-related nausea and vomiting." (*Id.* ¶ 29). Among other things, GSK's Oncology Division directly created new relationships with obstetricians and gynecologists, and also partnered with GSK's Consumer Health Care Division, which already had established relationships with obstetricians and gynecologists. (*Id.* ¶ 32). The two divisions allegedly entered a "co-marketing agreement" in 2001 to market Zofran to obstetricians and gynecologists for use in treating pregnancy-related nausea and vomiting. (*Id.* ¶¶ 33-34). According to the complaint, "[a]s a result of GSK's fraudulent marketing campaign," by 2002 Zofran had become the most frequently prescribed drug for treating pregnancy-related nausea and vomiting in the United States. (*Id.* ¶ 36).

Since 1993, the prescribing information for Zofran has included the following statement concerning its use during pregnancy:

---

[3] The brand-name master complaint asserts 13 causes of action against defendants GSK and Novartis: negligence (Count 1); negligent misrepresentation (Count 2); negligent undertaking (Count 3); negligence *per se* (Count 4); failure to warn (Count 5); breach of express warranty (Count 6); breach of implied warranties (Count 7); fraudulent misrepresentation and concealment (Count 8); violation of state consumer protection laws (Count 9); wrongful death (Count 10); survival (Count 11); loss of consortium (Count 12); and punitive damages (Count 13). The generic master complaint is virtually identical, but does not include causes of action for failure to warn, breach of express warranty, or breach of implied warranties.

> Pregnancy:  Teratogenic Effects:  Pregnancy Category B.  Reproduction studies
> have been performed in pregnant rats and rabbits at I.V. doses of up to 4 mg/kg
> per day and have revealed no evidence of impaired fertility or harm to the fetus
> due to ondansetron.  There are, however, no adequate and well-controlled studies
> in pregnant women.  Because animal reproduction studies are not always
> predictive of human response, this drug should be used during pregnancy only if
> clearly needed.

(*Id.* ¶ 50).  The complaint alleges that "[t]his statement is false and misleading because animal studies conducted by or on behalf of GSK outside of the United States have in fact revealed evidence of teratogenic effects due to ondansetron."  (*Id.* ¶ 51).[4]  It further alleges that the statement is false and misleading "because [d]efendants failed to conduct post-market studies that were properly designed to identify Zofran's true teratogenic risk," and misleading "because it states that Zofran should be used during pregnancy if it is clearly needed, without limiting that representation to situations where it is clearly needed for the prevention of chemotherapy-induced nausea and vomiting, radiation therapy-induced nausea and vomiting, or post-operative nausea and/or vomiting."  (*Id.*).

Count Two alleges a claim for negligent misrepresentation.  It alleges generally that defendants "falsely and negligently misrepresented material facts on which plaintiffs and their healthcare providers acted," and that defendants "also failed to disclose material facts regarding the safety and efficacy of Zofran to treat morning sickness."  (*Id.* ¶¶ 72-73).  It further alleges that defendants "made misrepresentations through their advertisements, labeling, marketing, marketing persons, notices, product information, and written and oral information provided to patients and medical providers" about the safety of ingesting Zofran during pregnancy.  (*Id.* ¶ 76).  It then alleges:

> 77.     Defendants negligently represented to the expectant mothers and the

---

[4] The complaint specifically alleges that a study conducted in Japan in the 1980s "revealed clinical signs of toxicity, intrauterine fetal deaths, stillbirths, congenital heart defects, craniofacial defects, impairment of ossification (incomplete bone growth), and other malformations" due to ingestion of ondansetron during pregnancy.  (*Id.* ¶ 45).

medical and healthcare community, including Plaintiffs and their healthcare providers, that:

(a)     Animal studies of ondansetron showed no harm to fetuses;

(b)     Zofran should be used during pregnancy if it is clearly needed, without limiting that representation to situations where it is clearly needed for the prevention of chemotherapy-induced nausea and vomiting, radiation therapy-induced nausea and vomiting, or post-operative nausea and/or vomiting;

(c)     As to GSK, Zofran was safe and effective for treating pregnancy-related nausea and vomiting;

(d)     As to GSK, Zofran was a safe and effective prophylactic treatment for preventing pregnancy-related nausea and vomiting;

(e)     As to GSK, Zofran had been adequately tested and studied in pregnant women;

(f)     As to GSK, Zofran use during pregnancy did not increase the risk of birth defects.

(*Id.* ¶ 77).  It goes on to allege in general terms that defendants had actual or constructive

knowledge of the falsity of the statements.  (*Id.* ¶ 78).  It then alleges:

80.     In reasonable reliance upon said representations, Plaintiffs' prescribers were induced to prescribe Zofran and recommend the drug as safe for treating pregnancy-related nausea, and Plaintiffs were induced to and did use Zofran to treat pregnancy-related nausea.  . . .

81.     Defendants' labeling of Zofran was also rendered misleading by the omission of the material risk information listed in the preceding count.

82.     Plaintiffs and their healthcare providers justifiably relied on Defendants' representations and non-disclosures when ingesting Zofran.

(*Id.* ¶¶ 80-82).

Count Two further alleges that plaintiffs and their healthcare providers justifiably relied

on defendants' misrepresentations and non-disclosures when prescribing and ingesting Zofran,

and that plaintiffs' prescribing doctors would not have prescribed Zofran had they known of the

risks.  (*Id.* ¶ 82).

Count Eight alleges fraudulent misrepresentation, "in the broadest sense, pursuant to all applicable [state] laws."  (*Id.* ¶ 127).  The complaint repeats the allegations of ¶ 77, quoted above, and alleges knowledge, intent, and reasonable reliance by prescribing physicians, all in general terms.  (*Id.* ¶¶ 130-33).  Count Nine alleges violation of various state consumer protection laws, again in general terms.[5]

### D.       **Proposed New Factual Allegations**

On October 13, 2016, defendant GSK filed a partial motion to dismiss all fraud-based claims against it in both the brand-name master complaint and generic master complaint.[6]  On April 24, 2017, the Court denied the motion to dismiss, but stated that the master complaints failed to state a claim for fraud based on GSK's alleged marketing and advertising campaign.  On November 13, 2017, plaintiffs filed the present motion to amend the master complaints to effectively reinstate the advertising and marketing-based fraud claims.

The proposed amended complaint adds dozens of paragraphs of factual allegations.  The new allegations have been summarized by plaintiffs as follows:

> Put simply, GSK built a 'blockbuster' drug on the back of actionable misrepresentations about the safety and efficacy of Zofran for the treatment of Nausea and Vomiting in Pregnancy (NVP), *and these misrepresentations were made outside the confines of the FDA-approved label.*  Over an extended period of time spanning the duration of the drug's lifecycle at GSK (1991 – 2015), the company's Sales and Marketing departments, in conjunction with its Medical Information (MI) department, perpetuated a massive campaign of misrepresentations surrounding the drug's ability to safely treat NVP.  This promotional strategy was a targeted assault on the *entire* community of physicians whom GSK knew to be most likely to prescribe an antiemetic for treatment of

---

[5] The generic master complaint includes the same three counts, but the fraudulent misrepresentation count is Count Five and the count alleging violations of state consumer protection laws is Count Six.

[6] On October 26, 2016, plaintiffs filed a motion to strike that motion.  The motion to strike was denied at the November 10, 2016 status conference.  On January 3, 2017, plaintiffs filed their opposition to GSK's motion to dismiss.

NVP:  Obstetricians/gynecologists (OB/GYNs) and Emergency Medicine (EM)
doctors.

(Pl. Mem. in Opp. to Mot. for Judgment on the Pleadings at 2) (emphasis in original).

As evidence of defendant's alleged nationwide scheme to market Zofran for pregnancy,
plaintiffs allege that GSK used "special sales teams who targeted 'non-traditional' prescribers
like OB/GYNs," who were trained to stress that Zofran was a "Category B" drug and therefore
safe.  (*Id.* at 2-3).  They allege that the sales teams directly called on at least 9,000 physicians
nationwide, and targeted others through various forms of promotional marketing.  (*Id.* at 3).

Plaintiffs further allege that defendant marketed Zofran in a variety of OB/GYN journals,
such as the *American Journal of Obstetrics & Gynecology*, *Contemporary OB/GYN*, and *The
Female Patient*.  (Pl. Mem. in Supp. of Mot. to Amend at 12-13).  GSK allegedly established
advisory boards containing practicing OB/GYNs, and performed outreach by "Key Opinion
Leaders" and consultants, in-person briefings in OB/GYN clinical settings, and presentations at
"large OB/GYN society meetings" such as annual meetings sponsored by the American
Congress of Obstetricians and Gynecologists ("ACOG").  (*Id.* at 11-13).  Plaintiffs further allege
that defendant funded a MediView Report highlighting off-label information by three physicians
that was "widely-circulated" to "at least 15,000 U.S.-based OB/GYNs" and possibly "the entire
U.S. population of OB/GYNs."  (*Id.* at 13).

The purpose of that marketing campaign, according to the amended complaint, was to
induce physicians to prescribe Zofran to pregnant women by misrepresenting its safety and
efficacy.

### E.     Proposed Amendments to Claims

The current master complaint includes claims for negligent misrepresentation (Count
Two), fraudulent misrepresentation (Count Eight), and under state consumer protection laws that

bar deceptive practices (Count Nine).[7]  The Court, in its April 24, 2017 memorandum and order,

concluded that those claims complied with the requirements of Fed. R. Civ. P. 9(b) to the extent

that they were based on the product labeling for Zofran, but not to the extent that they were

based on more generalized allegations arising out of GSK's marketing and advertising activities.

In the proposed amended master complaint, plaintiffs essentially seek to reassert claims

for misrepresentation arising out of GSK's marketing and advertising activities.  Other than

factual allegations incorporated by reference, Count Two is unchanged in the amended version;

Count Eight adds a single paragraph (paragraph 249); and Count Nine is unchanged.[8]

## II.     Motion to Amend

### A.     Legal Standard

Under Rule 15(a), a party may amend a "pleading" without leave of court in certain

relatively narrow circumstances.  Fed. R. Civ. P. 15(a).[9]  "In all other cases, a party may amend

its pleadings only with the opposing party's written consent or the court's leave.  The court

should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Nonetheless,

amendments may be denied on the basis of "undue delay, bad faith or dilatory motive on the part

of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue

prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of

amendment."  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  In determining whether to grant a

---

[7] It also includes claims for negligence, breach of warranty, and other tort-based claims.

[8] Paragraph 249 of the proposed amended complaint states as follows:  "In violation of existing standards and duties of care, Defendant made fraudulent misrepresentations through their advertisements, labeling, marketing, marketing persons, notices, product information, and written and oral information provided to patients and medical providers."

[9] A party may amend a pleading once as a matter of course within "21 days after serving it," or "if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier."  Fed. R. Civ. P. 15(a)(1).

motion to amend, the court must examine the totality of the circumstances and "exercise its informed discretion in constructing a balance of pertinent considerations." *Palmer v. Champion Mortg.*, 465 F.3d 24, 30-31 (1st Cir. 2006).

**B.      Analysis**

Defendant has opposed the motion to amend in part on the basis of undue delay. It is well-established that "undue delay in moving to amend, even standing alone, may be . . . an adequate reason" to deny a motion for leave to amend. *In re Lombardo*, 755 F.3d 1, 3 (1st Cir. 2014) (citing *Foman*, 371 U.S. at 182); *accord Calderon-Serra v. Wilmington Trust Co.*, 715 F.3d 14, 20 (1st Cir. 2013) ("Appreciable delay alone, in the absence of good reason for it, is enough to justify denying a motion for leave to amend."). "[W]hen considerable time has elapsed between the filing of the complaint and the motion to amend, the movant has [at the very least] the burden of showing some valid reason for his neglect and delay." *In re Lombardo*, 755 F.3d at 3 (second alteration in original) (quoting *Stepanischen v. Merchs. Despatch Transp. Corp.*, 722 F.2d 922, 933 (1st Cir. 1983)) (internal quotation marks omitted).

Plaintiffs contend that they timely moved to amend the complaint after receiving approximately 1.3 million pages in discovery concerning GSK's marketing of Zofran from 1998 to 2006. (Pl. Mem. in Supp. of Mot. to Amend at 4 n.1). They contend that they did not receive the entirety of the relevant files until July 31, 2017, and that the documents revealed critical new facts underpinning their marketing and advertising-based fraud claims.

Defendant contends that plaintiffs were first alerted in March 2015 to the possibility that their fraud-based claims failed to meet the heightened pleading requirements of Rule 9(b). (Def. Mem. in Opp. to Mot. to Amend at 6). Plaintiffs then fully litigated defendant's partial motion to dismiss, and now seek leave to make an amendment that would, in effect, reverse that ruling. As

this Court previously stated, "[t]he practice of waiting to amend a complaint until after the Court has ruled on a motion to dismiss is troublesome, to say the least." *United States ex rel. Hagerty v. Cyberonics, Inc.*, 146 F. Supp. 3d 337, 344 (D. Mass. 2015). In such circumstances, the First Circuit has stated that courts are to "discourage any expectation that there will be 'leisurely repeated bites at the apple.'" *In re Biogen Inc. Sec. Litig.*, 857 F.3d 34, 46 (1st Cir. 2010) (quoting *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 57 (1st Cir. 2008)).

In any event, it is no doubt true that plaintiffs were able to obtain new information through discovery that relates to the alleged fraudulent misrepresentations. The problem, though, is that Rule 9(b) requires a complaint alleging fraud to state with specificity the false statements on which the plaintiff allegedly relied.[10] Here, the specific "off-label" misrepresentations on which plaintiffs base their claims could have been discovered much sooner.[11] Discovery may have been necessary to establish proof of the statements' falsity, or that defendant made the statements knowingly, but not the contents of the representations themselves. Plaintiffs have failed to allege, in a timely fashion, the specific "off-label" representations on which they base their claims.

It is true that these cases present an unusual situation because the alleged statements were not made directly to plaintiffs themselves, but to plaintiffs' physicians. The physician is a learned intermediary who made the decision to prescribe the drug. But it is difficult to see why that fact should vitiate the basic principle, at least as a general matter. If the physician is the

---

[10] By definition, the victim of the misrepresentation—the defrauded party—knows what was represented to her, because she must have reasonably relied upon that statement to her detriment for it to be actionable. And, by definition, the victim did not know that the representation was false at the time it was made; if she did, it would have been unreasonable to rely on it.

[11] For the sake of simplicity, the Court will not address claims of misrepresentation by omission, as the present motion does not involve such a claim. Of course, a pharmaceutical company unquestionably has a duty to disclose material facts concerning the safety of its product on the product label.

person to whom the false representation was made, it should have been a relatively easy matter for the patient-plaintiff to ascertain what the physician was told, and what he or she relied on. For example, plaintiffs could have asked questions such as: Was the physician visited by a sales representative who made a representation as to Zofran? Did the physician attend a particular ACOG conference? Did he or she read the MediView report that was "widely circulated?" And, was there any other form of "off-label" contact between GSK and the physician that induced him or her to prescribe Zofran in reliance on representations about its safety?

With basic investigative diligence, plaintiffs could have uncovered the specific facts underlying their misrepresentation claims. Nothing barred plaintiffs from taking that fundamental step. And if a particular plaintiff's physician cannot answer those questions affirmatively—whether because the physician had no such contact, cannot remember, or is no longer alive—it is unclear how that plaintiff could prove fraud in any event.

Accordingly, the Court will not permit amendment of the master complaint to the extent it asserts claims for negligent misrepresentation, fraudulent misrepresentation, or violation of state consumer-protection laws based on representations by Zofran in its advertising and marketing activities (as opposed to the labeling of the product). The assertion of such claims at this stage is untimely. Claims of misrepresentation based on the product label will, however, remain part of the complaint.

Nevertheless, that conclusion does not require that the motion to amend be denied in its entirety. The proposed amended complaint, as noted, adds dozens of new paragraphs of factual allegations, presumably most of them based on information obtained in the discovery process. The Court sees no reason why the complaint cannot be amended to add those factual assertions. Some of it may be surplusage for the trial of individual cases; for example, in a case where a

prescribing physician never read the MediView Report, the allegations as to its preparation and distribution are irrelevant. But the complaint is a master complaint, and there appears to be no particularized prejudice to defendant to permit the inclusion of the new factual allegations.

There also remains the issue of the specific language of Counts Two, Eight, and Nine, which (in both the existing master complaint and the proposed master complaint) intermingle claims of misrepresentation based on the product label (which remain valid claims) and on advertising, marketing, and other promotional activities (which do not). Rather than attempting to strike the relevant language, the Court will permit plaintiffs to propose a form of amended complaint that is consistent with this ruling.

Two additional points should be noted. First, the Court is making no ruling as to any specific individual case—and, certainly, not as to any future, not-yet-filed case, in which an individual plaintiff is able to, and does, identify an alleged misrepresentation at the time the complaint is filed. The resolution of that question will await another day.

Second, the practical effect of this ruling is likely to be fairly limited. While the relevance of particular items of evidence in particular cases will have to be determined at a future time, it seems likely that at least some of the evidence in question may be admissible in the trials of individual cases. For example, if a physician was induced to prescribe Zofran to a pregnant woman off-label because of the false assurances of a sales representative as to its safety, such evidence would likely be admissible in that trial, whether or not a fraud claim has been asserted. Again, the resolution of those questions will also await another day.[12]

IV.    **Conclusion**

For the foregoing reasons, plaintiffs' motion to amend the brand-name master complaint

---

[12] Because the Court finds that plaintiffs have exhibited undue delay, it need not address defendant's argument that the proposed new claims are futile.

and the generic master complaint is DENIED to the extent it seeks to add claims of negligent misrepresentation, fraudulent misrepresentation, and violation of state consumer-protection laws arising out of alleged misrepresentations other than the product labeling for Zofran, and is otherwise GRANTED. Plaintiffs shall file a motion with a proposed amended complaint consistent with this memorandum and order within 21 days, or by June 8, 2018.

**So Ordered.**


/s/ F. Dennis Saylor
F. Dennis Saylor IV
Dated: May 18, 2018                    United States District Judge